Edward D. WEIL, Appellant,

v.

Charles D. FRITZ, Wilbur F. Evans, Anson R. Cooke, Appellees.

Appeal No. 79-534.

United States Court of Customs and Patent Appeals.

June 28, 1979.

Daniel C. Block, Richmond, Cal., attorney of record, for appellant, Jerry D. Voight, Herbert H. Mintz, Finnegan, Henderson, Farabow & Garrett, Washington, D. C., of counsel.

Alan H. Bernstein, Stanley H. Cohen, Philadelphia, Pa. (Caesar, Rivise, Bernstein & Cohen, Ltd.) Philadelphia, Pa., and Robert C. Brown, New York City, attorneys of record, for appellees, James C. Arvantes, Arlington, Va., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and RE,[*] Chief Judge.

BALDWIN, Judge.

This appeal by Weil[1] is from an award of priority of invention, by the Patent and Trademark Office Board of Patent Interferences (board), of a single count in issue to Fritz et al.[2] (Fritz) after remand from this court in *Weil v. Fritz*, 572 F.2d 856, 196 USPQ 600 (1978). We affirm.

### Background

The single count in interference is as follows:

1. A method for the inhibition of plant growth which comprises applying thereto an effective amount of 2-chloroethylphosphonic acid.[3]

As we outlined in the prior *Weil v. Fritz*, the chronology of applications is thus:

| Party Fritz | Party Weil |
| --- | --- |
| Application Serial No. 617,860 (hereinafter Fritz I) filed February 23, 1967; abandoned December 1, 1969 applicants: Fritz and Evans | |

---

[*] The Honorable Edward D. Re, United States Customs Court, sitting by designation.

[1.] Application serial No. 826,653, filed May 21, 1969, assigned to Stauffer Chemical Company.

[2.] Application serial No. 221,803 filed January 28, 1972 (hereafter Fritz IV) assigned to Amchem Products, Inc., a division of Union Carbide Corporation.

[3.] 2-chloro-ethylphosphonic acid will hereafter be referred to as "2–CEPA."

Party Fritz     Party Weil

Application Serial No. 693,698
(hereinafter Fritz II)
filed December 27, 1967;
abandoned April 2, 1970
continuation-in-part of
Fritz I
applicants: Fritz and
Evans (amendment approved
March 27, 1970 adding
Cooke as joint inventor)

Application Serial
No. 826,653 filed
May 21, 1969

Application Serial No. 869,386
(hereafter Fritz III)
filed October 24, 1969
continuation-in-part of
Fritz II
applicants: Fritz, Evans,
and Cooke

Application Serial No. 221,803
(Fritz IV)
filed January 28, 1972
division of Fritz III
applicants: Fritz, Evans,
and Cooke

When the case was last here, we disposed of a number of preliminary questions and remanded to the board so that it could specifically consider whether the Fritz II application set forth a disclosure of the best mode contemplated by the inventor at the filing date of that application. Additionally, the board was to consider, for completeness, the sufficiency of various proofs regarding reduction to practice by Fritz et al.

Since we affirm the holding of the board on the best mode issue, we do not find it necessary to discuss or reach the latter questions.

### Board

Weil argued before the board that Fritz II fails the "best mode" test of § 112 because of Fritz' failure to refer to the pH sensitivity of 2–CEPA. It appears to be necessary that 2–CEPA remain in solution if it is to perform the function recited in the count. The compound will prematurely decompose, with production of ethylene gas, if the solution is not maintained in a sufficiently acidic condition.

The board considered the record to be clear in establishing that the Fritz parties in interest knew of the pH sensitivity of 2–CEPA prior to the filing of Fritz II. One of the Fritz coinventors, Dr. Cooke, testified:

RXQ2. When did you first observe that 2-chloroethyl phosphonic acid tends to decompose in solutions which have a pH of about 4.5 or above? A. First observations of this were within two months.

RXQ3. Within two months of what? A. I can give you the date, but it would be within two months. It would have been around November of 1965, December of 1965. I can't give you an exact date.

Similarly, Mr. Bishop, Director of the Agricultural Chemicals Laboratory of Amchem, testified:

ZQ12. Again with reference to Exhibit 20, do you know if Mr. Hart tried any basic or alkaline solution? A. We were aware of stability problems if the pH got above 3½ to 4, so we avoided any alkaline solutions.

XQ13. You were aware of this in the time period of '66 and '67 when Mr. Hart was doing his formulation work? A. Yes. We were aware of that pretty early in the game.

Fritz argued before the board that Examples 35 and 42 of Fritz II[4] were examples specifically setting forth the best mode.

4. These examples are:

EXAMPLE 35

Young kidney beans plants (phaseolus vulgaris) were sprayed at the first trifoliate stage using aqueous solutions of 2-chloroethylphosphonic acid. Spraying was effected so as to apply an equivalent of 1 lb. of the phosphonic acid compound per acre of soil surface. Sixty days following treatment an inspection of the plants showed increased fruiting and increased total plant weight as compared with untreated plants.

Weil took the position that the best mode could not be determined from these examples in that no concentration of 2–CEPA is provided therein.

The board considered it proper to read the application rates of those examples in light of the preferred range of concentration found in the specification [5] and thereby derive the exemplified concentration (or at least a range of possible concentrations). The most dilute solution obtainable within the specification's preferred range was calculated to be 600 ppm 2–CEPA and that of the two examples to be 1200 ppm.

Weil argued that the use of alkaline water [6] in mixing the compositions as used might well result in a pH in excess of that known by Fritz to be useful. The board considered the testimony of Weil's own witness, Dr. Tseng, adequate to rebut that contention. Dr. Tseng testified on cross-examination:

Q. For instance, did you run a pH test using 2-chloroethylphosphonic acid at 250 per million? A. 250?

Q. 250. A. I think so; 250, yes.

Q. What was the pH of the resulting solution of 250 parts per million 2-chloroethylphosphonic acid in water? A. About 3.5, or something.

#### Observations 60 Days After Treatment

| Treatment | No. Bean Pods/Plant | Plant Weight (Above Ground Parts), grams |
|---|---|---|
| Control | 20 | 83 |
| Phosphonate compound | 25 | 134 |

Visual comparison of the check and treated plants showed the latter were shorter in height with heavier stems and appreciably more lateral shoots.

#### EXAMPLE 42

Cotton plants (Gossypium hirsutum) were sprayed at the stage when squares were just forming with aqueous solutions of the compound 2-chloroethylphosphonic acid so as to apply thereto from 1 to 4 lbs. of the phosphonic acid compound per acre of soil surface. Observations of the treated plants, as well as of untreated controls, were made ten

Q. Did you run a pH evaluation involving 500 parts per million 2-chloroethylphosphonic acid in water? A. I personally did not, the chlor acid itself.

Q. Acid? A. No sir.

Q. Did you run a pH evaluation where 2-chloroethylphosphonic acid was present in an amount greater than 250 parts per million water? A. I did not. I don't believe I measured larger than 250 parts per million.

Q. You just testified that when you ran a pH evaluation of 250 parts per million 2-chloroethylphosphonic acid in the water that the pH of that solution was 3.1. I believe that is your testimony. A. About 3.5. I don't exactly remember the number.

Q. What was the pH of the water that you used in that experiment? A. The pH of the water was approximately 8.4, something like that.

Q. Where there is a solution of 500 parts per million of 2-chloroethylphosphonic acid in water, isn't it correct that the pH would be less than 3.5? A. I think so.

Q. And where there is a solution of a thousand parts per million of 2-chloroethylphosphonic acid in water, wouldn't that solution be, the pH of that even less than the pH of the 500 parts per million solution? A. I think so.

(10) weeks after spray application, and are reported below:

| Lbs./Acre of Phosphonic Acid Compound | Average No. of Balls/Plant | Average Plant Height, inches |
|---|---|---|
| Control | 19.1 | 30.1 |
| 1 | 29.3 | 30.5 |
| 2 | 24.7 | 26.5 |
| 4 | 26.0 | 26.4 |

Increased yields of cotton as a result of treatment with a phosphonate compound used in the process of this invention are clearly apparent from the foregoing results.

5. Fritz II indicates:
It is preferred that the compounds used in the process of the present invention be applied at rates of $\frac{1}{2}$ to 4 lbs./acre in aqueous solution and that the application rate in terms of total volume varies from about 1 to 100 Gallons per acre.

6. Water having a pH of 8.4 is common in the Western United States.

The board then concluded that the derived "lowest possible" 1200 ppm concentration of the examples would have a value below the apparently critical pH limit of 3.5 as would any solution of 2–CEPA within the preferred range disclosed in Fritz II.

The board indicated that, in its view, the party Weil had the burden of proof in showing that Fritz et al. had concealed (intentionally or otherwise) the best mode for carrying out the invention. Since Weil did not sustain his burden pursuant to 37 CFR 1.257(a),[7] priority of invention was awarded to Fritz.

## OPINION

■ The statute, 35 U.S.C. § 112, paragraph one, requires that "[t]he specification * * * shall set forth the best mode contemplated by the inventor of carrying out his invention." This court has steadfastly followed the general rule that any party making the assertion that a U.S. patent specification or claims fails, for one reason or another, to comply with § 112 bears the burden of persuasion in showing said lack of compliance. *See In re Morehouse,* 545 F.2d 162, 192 USPQ 29 (Cust. & Pat.App. 1976); *In re Ghiron,* 442 F.2d 985, 58 CCPA 1207, 169 USPQ 723 (1971); *In re Marzocchi,* 439 F.2d 220, 58 CCPA 1069, 169 USPQ 387 (1971); *In re Cook,* 439 F.2d 730, 58 CCPA 1049, 169 USPQ 298 (1971); *In ·re Moore,* 439 F.2d 1232, 58 CCPA 1043, 169 USPQ 236 (1971). We see no reason to vary from this general rule when the subject is "best mode."

Weil argues, in essence, that Fritz' prior appreciation of the pH sensitivity of 2–

CEPA solutions and the potential adverse impact of that sensitivity on the successful practice of the method in the count coupled with complete silence regarding pH constitutes a substantial showing that Fritz II does not disclose the "best mode" contemplated by the inventors.

■ We do not agree. We have, on various occasions, observed that an applicant, in drafting an application, may choose any method he deems desirable in portraying essential information so long as that method fulfills the description [8] and enablement [9] requirements of 35 U.S.C. § 112, paragraph one. It is not up to this court to state *how* the applicant displays his information, but only, under proper circumstances, to review *whether* he has done so adequately under the statute. So it should be with the "best mode" requirement. In our view, the inventors of Fritz II have merely selected a particular form of clearly relaying all the information (concentration and dosage in an aqueous solution), pertinent and necessary, to one having ordinary skill in the art concerning the particular embodiment which was contemplated to be the "best mode." The board found it reasonable to read the preferred ranges disclosed in the specification into the two noted examples and thereby derive that "best mode." Appellees argue in their brief that even this is not necessary—that the mere disclosure of a particular range of concentrations as "preferred" is sufficient. In this case, we agree.[10] Appellant's well-argued contention that pH sensitivity of 2–CEPA solutions is fatal to such a broad disclosure of the "best mode" is not persuasive.[11] As far

---

7. This section provides:

§ 1.257 Burden of proof.

(a) The parties to an interference will be presumed to have made their inventions in the chronological order of the filing dates of their applications for patents involved in the interference or the effective filing dates which such burden of proof will rest upon the party who shall seek to establish a different state of facts.

8. *See In re Wertheim,* 541 F.2d 257, 262, 191 USPQ 90, 96 (Cust. & Pat.App.1976); *In re Smith,* 481 F.2d 910, 914, 178 USPQ 620, 624 (Cust. & Pat.App.1973).

9. *See In re Marzocchi,* supra 439 F.2d at 223, 58 CCPA at 1073, 169 USPQ at 369.

10. The word "preferred," while not always dispositive of a question regarding the delineation of a "best mode," certainly must be said to be of considerable evidentiary value in discerning what the inventor subjectively "contemplated" to be his "best."

11. Appellant additionally makes great weight of the fact that certain of the examples use concentrations of 2–CEPA far below the minimum concentration limit of the preferred

as can be determined from this record, each composition reasonably within the preferred ranges of the specification is stable and fully capable of effectuating the result recited in the count.[12] Enumeration of possible problems, while desirable, is not absolutely essential unless such a nondisclosure strikes at the truthfulness of the presumption that the "mode" described is indeed the "best" contemplated.[13] We do not think such to be the case here. The method of disclosing the "best mode" appears to be no more than an equivalent to the pH method argued by appellants. We affirm the decision of the board.

### Taxation of Cost

Appellants ask that the cost of printing 431 out of the total 609 pages of the printed transcript be assessed to the appellees under Rule 5.6(c) of this court.[14] Appellees argue that under Court Rule 1.4(a),[15] Rule 39(a)[16] of the Federal Rules of Appellate

Procedure (FRAP) should apply and all costs taxed against appellants.

Our rules deal adequately with this situation and, accordingly, recourse to the FRAP is not proper.

■ We agree with appellant that the noted addition to the record was not necessary for the purposes of his appeal. Appellees are rearguing the issue of reduction to practice which they lost below. The addition to the record was useful only in support of appellees' position and appellees should therefore pay for the addition to the record. *Meitzner v. Mindick,* 549 F.2d 775, 785, 193 USPQ 17, 24–25 (Cust. & Pat.App.), *cert. denied,* 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124, 195 USPQ 465 (1977); *Myers v. Feigelman,* 455 F.2d 596, 59 CCPA 834, 172 USPQ 580 (1972); *Gortatowsky v. Anwar,* 442 F.2d 979, 58 CCPA 1266, 170 USPQ 41 (1971).

*AFFIRMED.*

range, i.e., Example 50 uses 100 ppm and Example 57 uses 220 ppm. On this basis, appellant concludes that the examples are not indicative of the "best mode." We do not consider this to be a convincing argument in that the particular function performed in each of those examples (fruit color promotion in Example 50 and plant freeze protection in Example 57) is not the same as the claimed function required by the count.

**12.** As was noted in *In re Bosy,* 360 F.2d 972, 975, 53 CCPA 1231, 1236, 149 USPQ 789, 792 (1966):

[T]here is no statutory basis for reading into the best mode portion a requirement "that the mode disclosed be in fact the *optimum* mode of carrying out the invention" *In re Gay * * *,* [309 F.2d 769, 775, 50 CCPA 725, 731–32, 135 USPQ 311, 315 (1962). Emphasis in original.]

**13.** Compare *Dale Electronics, Inc. v. R. C. L. Electronics,* 488 F.2d 382, 180 USPQ 225 (1st Cir. 1973), in which the inventor had testified that the patent specification did not even disclose the best material known for carrying out the invention and that materials within generic "recommended" classes would not work. Similarly, *see In re Sichert,* 566 F.2d 1154, 196 USPQ 209 (Cust. & Pat.App.1977); *Union Carbide Corp. v. Borg-Warner Corp.,* 550 F.2d 355, 193 USPQ 1 (6th Cir. 1977).

**14.** Rule 5.6(c) states:

(c) *Cost of Printing.* The cost of producing the transcript shall be paid by the appellant. If appellee shall cause matter to be included in the transcript which appellant considers unnecessary, appellant may move to impose on appellee the cost of printing such matter. Said motion shall be filed prior to the oral argument or concurrently with the submission of the case on brief. A statement of costs for such matter shall be submitted to the clerk. The court will act on the motion concurrently with the final decision. In cases where two or more parties appeal and the parties cannot agree on the apportionment of printing costs, the court will apportion them.

**15.** Rule 1.4(a) states:

(a) *Federal Rules of Appellate Procedure.* The Federal Rules of Appellate Procedure shall govern any practice or procedure not specifically covered by these rules.

**16.** FRAP Rule 39(a) provides:

(a) *To Whom Allowed.* Except as otherwise provided by law, if an appeal is dismissed, costs shall be taxed against the appellant unless otherwise agreed by the parties or ordered by the court; if a judgment is affirmed, costs shall be taxed against the appellant unless otherwise ordered; if a judgment is reversed, costs shall be taxed against the appellee unless otherwise ordered; if a judgment is affirmed or reversed in part, or is vacated, costs shall be allowed only as ordered by the court.