**Charles T. NABER and George C. Lockwood, Appellants,**

v.

**James R. CRICCHI, Appellee.**

**Appeal No. 77–556.**

United States Court of Customs and Patent Appeals.

Dec. 22, 1977.

Rehearing Denied Feb. 23, 1978.

William J. Birmingham, Chicago, Ill., Attorney of record for appellant; Lowell C. Bergstedt, Dayton, Ohio, of counsel.

James B. Hinson, Pittsburgh, Pa., Attorney of record for appellee; Charles L. Menzemer, Pittsburgh, Pa., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

This appeal is from the decision of the Patent and Trademark Office Board of Patent Interferences (board) awarding priority of invention of the counts in issue to the junior party, Cricchi. The counts were copied by Cricchi[1] from a patent to Naber et al. (Naber) No. 3,719,866, issued March 6, 1973, and entitled "Semiconductor Memory Device." The dispositive question, which the board decided in favor of Cricchi, is whether Cricchi was reasonably diligent from a time just prior to Naber's entry into the field (June 1970) until Cricchi's actual reduction to practice (September 1971). We reverse.

### Subject Matter of the Counts

The invention is an improved "drain-source-protected" metal-nitride-oxide-semiconductor (MNOS) device which can be used as a nonvolatile, electrically alterable memory element in various integrated circuits. The specific improvement (illustrated by Figure 3 of the Naber patent) is that the silicon oxide layer (56) in the vicinity of the drain (54) and source (55) of the transistor is made thicker (shown at areas 58 and 60) than the corresponding layer in prior art devices.

---

1. In an amendment filed June 1, 1973, to his application serial No. 219,463, filed January 20, 1972, entitled "Enhancement Mode Limited MNOS Memory Device."

FIG. 3

All of the counts include a recitation of this structure. Count 1 is illustrative and reads as follows:

Count 1

A metal-nitride-oxide-semiconductor device comprising:

a semiconductor material substrate of one conductivity having a first and a second region of opposite conductivity extending therein, said first and second regions being separated by a channel region having a channel formed therein through which majority carriers can flow from said first region to said second region, said first, second, and channel regions all extending from one surface of said substrate;

a layer of oxide material affixed to said one surface of said substrate to interface with the junction of said first region-channel region, said channel region, and the junction of said channel region-second region, said oxide layer having a first thickness in the vicinity of said first region-channel region junction and in the vicinity of said channel region-second region junction and a second thickness therebetween;

a layer of nitride material affixed to said oxide material and spaced apart from said substrate by said oxide material; and

a layer of conductor material affixed to said nitride material and spaced apart from said oxide material by said nitride material;

said first thickness being of more than a charge tunnel thickness to prevent any charge from tunneling between said ox-

ide material-nitride material interface and said substrate-oxide material interface and said second thickness being of less than a charge tunnel thickness to allow charge to tunnel between said oxide material-nitride material interface and said substrate-oxide material interface.

*Proceedings Below*

The board found that Cricchi established conception of the subject matter of the counts on October 22, 1969, and concluded that the combined testimony of Cricchi's co-workers established—

that at the time Cricchi conceived of the device . . . improvements were necessary in deposition processes of the oxide and nitride layers and that efforts to improve on the processes were part of a continuous program which extended from prior to October of 1969 into October of 1970.[2]

The board also found that Cricchi Exhibit 100, consisting of copies of time cards for four project numbers, "indicates reasonably continuous activity charged to the project numbers . . . used to identify the programs for constructing and testing the MNOS transistor" embodying the counts in issue. The board was not persuaded by Naber's argument that experiments directed at improving layer deposition techniques generally did not satisfy the "reasonable diligence" requirement, not being directed at construction and testing of the MNOS device of the counts. It said:

[T]his work was required in order to reduce to practice the transistor conceived by Cricchi on October 22, 1969. Dr. Corak [Cricchi's supervisor] testified that improvement in the method of deposition was required in order to produce a useful device rather than a mere laboratory device.

In the Request for Reconsideration, Naber argued that Cricchi was not reasonably diligent during the period from June to Octo-

2. The program of improving deposition techniques was still going on in 1975 at Westinghouse, Cricchi's assignee.

ber 1970 since work done then was directed at improving layer deposition techniques generally; further, that Cricchi Exhibit 100 was not proof of diligence during the period from October 1970 to September 1971. The board adhered to its original decision.

## OPINION

### 1. Work on Layer Deposition Techniques (June to October 1970)

█ The record shows that the work done at Westinghouse to improve oxide and nitride layer deposition techniques was generally applicable to all MNOS devices, not merely the "drain-source protected" device of the counts, and that this work had in fact commenced *prior* to Cricchi's conception of the invention. It is well settled that, to satisfy the "reasonable diligence" requirement of 35 U.S.C. § 102(g), the work relied on must ordinarily be directly related to reduction to practice of the invention of the counts in issue. *Anderson v. Scinta*, 372 F.2d 523, 54 CCPA 1269, 152 USPQ 584 (1967); *Martin v. Snyder*, 214 F.2d 177, 41 CCPA 1010, 102 USPQ 306 (1954); *Gunn v. Bosch*, 181 USPQ 757 (Bd.Pat.Int'f 1973); *Moore v. Harris v. Hale*, 92 USPQ 187 (Bd. Pat.Int'f 1951). However, work in preparation for filing related patent applications may suffice (*e. g., Rey-Bellet v. Englehardt*, 493 F.2d 1380, 181 USPQ 453 (Cust. & Pat. App. 1974)), as may work required to develop a first invention in order to develop or reduce to practice a second invention (*e. g., Keizer v. Bradley*, 270 F.2d 396, 47 CCPA 709, 123 USPQ 215 (1959); *Thompson v. Dunn*, 166 F.2d 443, 35 CCPA 957, 77 USPQ 49 (1948)).

There is no evidence that Cricchi's layer deposition techniques work was in prepara-tion for filing related patent applications or was required to develop a first invention needed to proceed with the invention of the counts. Although the board found that "this work was required in order to reduce to practice" the invention of the counts, both Cricchi and his supervisor admitted that a simple transistor embodying the structure embraced by the counts could have been built and tested for its memory characteristics.[3] Cricchi chose not to proceed to a reduction to practice with a simple transistor, but to wait until work on layer deposition techniques progressed.[4] Since he admittedly "possessed the capability of conducting such a test," it was his burden to reconcile the waiting period with the "reasonable diligence" requirement. *Litchfield v. Eigen*, 535 F.2d 72, 76, 190 USPQ 113, 116 (Cust. & Pat.App. 1976).[5]

█ The board found, and Cricchi contends, that the work on layer deposition techniques was required to produce a "useful device," rather than a "mere laboratory device." However, there need not be commercial utility to have a reduction to practice. As this court said in *Goodrich v. Harmsen*, 442 F.2d 377, 383, 58 CCPA 1144, 1153, 169 USPQ 553, 559 (1971): "In the nature of things, testing goes on throughout the process of 'commercializing' and often continues after a product is on the market where it usually receives its severest test." Acceptance of the proposition that the "reasonable diligence" requirement was satisfied, notwithstanding delay due to general work (on layer deposition techniques needed to produce a commercially-acceptable device), would, in effect, grant Cricchi a reservoir of "reasonable diligence" arising from work commenced prior to con-

---

3. Naber does not contend, nor would we agree, that Cricchi was under an absolute obligation to choose the simplest device embodying the structure of the counts to attempt a reduction to practice.

4. Cricchi's brief contains the statement:' "The fact that the demonstration device might have been constructed *without doing this work* [the process development work relating to layer deposition techniques] has been clearly recognized by Cricchi during all phases of this case."

5. Public policy favors the early disclosure of inventions. This underlies the requirement for "reasonable diligence" in reducing an invention to practice, not unlike the requirement that, to avoid a holding of suppression or concealment, there be no unreasonable delay in filing an application once there has been a reduction to practice. See *Young v. Dworkin*, 489 F.2d 1277, 180 USPQ 388 (Cust. & Pat.App. 1974).

ception on October 22, 1969, and continuing into 1975. We are not persuaded that this accords with public policy favoring the early disclosure of inventions.

■ Cricchi's reliance on *Justus v. Appenzeller*, 177 USPQ 332 (Bd.Pat.Int'f 1971), is misplaced. In that case, a reduction to practice of the counts required a "bearing means" which Justus ordered to be custom made. Unforeseen circumstances delayed delivery of the bearings, with resultant delay in Justus' reduction to practice. Such circumstances are not present here. Cricchi had the materials and capability in June 1970 to produce a working MNOS memory device of the counts.[6]

We hold that work done at Westinghouse during the period from June to October 1970 directed at improving oxide and nitride layer deposition techniques generally applicable to all MNOS devices did not satisfy the requirement of "reasonable diligence" on the part of Cricchi.

### 2. Time Card Charges (October 1970 to September 1971)

■ Naber argues that Cricchi's testimony concerning the work performed under the four project numbers covered by time card charges of record is uncorroborated and, thus, cannot be used to show diligence; also, that work done under the project numbers after October 1970 was not directed at reducing to practice the invention of the counts.[7]

We are satisfied that at least some work done after October 1970 and charged to the project numbers had nothing to do with reducing to practice the invention of the counts. Thus, one Westinghouse employee (a Cricchi witness) testified that he did not begin working on the "834 device" (a device embodying the count limitations) until May 1971; but his time card charges show work done under the project numbers before that date.[8] This flatly contradicts testimony in the Cricchi record that if time was charged to the project numbers, the work being done was on the "834" project.

■ Naber's argument that Cricchi's uncorroborated testimony cannot satisfy the burden of showing "reasonable diligence" is well taken. *Kendall v. Searles*, 173 F.2d 986, 36 CCPA 1045, 81 USPQ 363 (1949). Cricchi did not present any documentary evidence showing specific acts at specific times directed at a reduction to practice of the invention of the counts. Instead, he relies on time cards showing work charged to four project numbers for this purpose. However, the time cards are not self-explanatory, and Cricchi's is the only testimony that undertakes to explain the work performed. Nothing in the record corroborates Cricchi's explanation. As pointed out above, testimony of one of Cricchi's own witnesses contradicts his allegation that time charged to the project numbers was directed solely at a reduction to practice of the invention of the counts.

Accordingly, we hold that the time card charges of record and Cricchi's uncorroborated testimony concerning the work covered thereby do not satisfy Cricchi's burden of proving "reasonable diligence" during the period from October 1970 to September 1971.

### 3. Motion to Tax Costs

Naber has moved to assess printing costs against Cricchi for the portions of the transcript requested by Cricchi. These cover all of the testimony of Naber's witnesses. Cricchi states that his reason for including such testimony in the transcript was that

---

6. On the record before us, the correctness of the board's conclusion, that such a device would have operated for only a "few hours" before failure, is questionable. In a proposal to the Air Force, Westinghouse indicated that it had developed an MNOS device early in 1969 that was operable for "greater than 1,000 hours."

7. Although appellants did not raise this issue in their main brief before the board, they did so in their Request for Reconsideration, and the board considered the argument in reaching its decision. Thus, the issue is properly before the court. Cricchi is incorrect in labeling the argument an improper new issue.

8. Indeed, Cricchi admits this in his brief.

Naber's Notice and Reasons of Appeal indicated that Naber would argue Cricchi's date of conception; that "[i]f Cricchi's date of conception was to be argued, this automatically raises the question of when did Naber et al. enter into the field."

Because Cricchi argued the issue of Naber's entry into the field before the board, it was not necessary for him to file a cross-appeal to preserve the issue for argument before this court. *Clauss v. Foulke*, 379 F.2d 586, 54 CCPA 1514, 154 USPQ 85 (1967). However, if that issue were to be argued before this court, it would have been Cricchi who would have raised the issue, Naber not having questioned the board's finding of Naber's date of entry into the field. Since the costs of printing the material necessary for the court to make a determination of the issues raised by appellee are normally assessed against appellee, *Meitzner v. Mindick*, 549 F.2d 775, 193 USPQ 17 (Cust. & Pat.App.), *cert. denied*, —— U.S. ——, 98 S.Ct. 174, 54 L.Ed.2d 124 (1977), Naber's Motion to Tax Costs to appellee Cricchi is granted.

The decision of the board awarding priority to Cricchi on counts 1–4 is *reversed*.

*REVERSED.*